**CONSUMER PARTY, Max Weiner, Lance Haver, William Thorn, and Lisa Brannan**

v.

**William R. DAVIS, Secretary of the Commonwealth of Pennsylvania; Richard Anderson, Bureau of Legislation, Commissions and Elections; Margaret Tartaglione, Marion Tasko and John Kane, Commissioners of the City of Philadelphia.**

Civ. A. No. 85–0836.

United States District Court, E.D. Pennsylvania.

Feb. 12, 1986.

---

David Kairys, Kairys & Rudovsky, Stefan Presser, Philadelphia, Pa., for plaintiffs.

Carl Vaccaro, Deputy Atty. Gen., Philadelphia, Pa., for defendants Davis and Anderson.

Ralph J. Teti, Divisional Deputy City Sol., Philadelphia, Pa., for other defendants.

FINDINGS OF FACT and
CONCLUSIONS OF LAW

SHAPIRO, District Judge.

This action is before the court following a final hearing. The court's earlier order granting the plaintiffs preliminary relief was vacated by the Court of Appeals on November 27, 1985, 778 F.2d 140. Plaintiffs contend that Act 190, 25 P.S. § 2872.1 ("Act 190"), enacted by the Pennsylvania General Assembly to solve the "ballot clutter" problem in Democratic Party primary elections in Philadelphia is unconstitutional as applied to the Consumer Party and its members. Act 190 markedly increased the number of signatures necessary to secure a place on the primary ballot of a political party.

In passing Act 190, the legislature unwittingly but effectively barred political parties with few registered members from nominating candidates for the primary election. Moreover, because primary nomination is the only route available for members of political parties to attain general election ballot access, 25 P.S. § 2862, small parties, unable to nominate candidates for the general election ballot, are deprived of meaningful participation in the political process.

This action was brought in the district court for the Eastern District of Pennsylvania by the Consumer Party and its members (appellants).[2] The complaint alleges that Act 190 deprives appellants of a primary election and that, in conjunction with other provisions of the Election Code, deprives them of general election ballot access, all in violation of appellants' first amendment rights.

*Consumer Party v. Davis*, 778 F.2d 140, 142 (3d Cir.1985) (footnote omitted).

After an evidentiary hearing and argument on plaintiffs' motion for a preliminary injunction prohibiting the application of Act 190 to the Consumer Party, the court found that while Act 190 might be constitutional alone, the Election Code as a whole now required the Consumer Party to nominate by primary but, because of Act 190's raised signature requirements, made it effectively impossible for Consumer Party candidates to appear on either the primary or general election ballots. A political body not qualifying for party status would find it much easier to place candidates on primary and general election ballots. Thus, the Consumer Party's success in achieving political party status resulted in its greater difficulty in electing candidates. The court found that this electorial scheme violated the rights of plaintiffs. *See Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

This court then applied the balancing test set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and found that:

1. The plaintiffs had demonstrated a high probability of success on the merits because it appeared clear that Consumer Party candidates *were* effectively denied all access to the *general* election ballot because of the increased signature requirements imposed by Act 190 in violation of the Constitution.

2. There was no constitutional right to a primary, and Pennsylvania's primary requirements were not so burdensome that they impermissibly discriminated against a small or new political party if and only if there were ballot access in the general election.

3. There was an important public interest in allowing the Pennsylvania state legislature, within constitutional bounds, to alleviate so-called "ballot clutter."

4. Increasing the number of signatures required for a primary ballot position did not constitute irreparable harm only if there was available a form of relief less intrusive to the state electoral scheme than invalidating signature requirements for primary nominations.

The court then considered four alternative forms of relief that might be afforded the Consumer Party to ensure its candidates access to the general election ballot:

i. Invalidating Act 190, at least for the Consumer Party, and reinstating former signature requirements to allow the Consumer Party to nominate its candidates at the primary election on May 21, 1985.

ii. Upholding Act 190 but invalidating 25 P.S. § 3155, at least for the Consumer Party, and permitting the Consumer Party to nominate the individual receiving the highest number of write-in votes on the primary ballot.

iii. Upholding Act 190 but invalidating 25 P.S. § 2862, at least for the Consumer Party, and permitting candidates to be nominated at party conventions.

iv. Upholding Act 190 but invalidating 25 P.S. § 2862 and interpreting § 2911(e)(6) and § 2936, at least for the Consumer Party or any party unable to obtain the required number of signatures in the primary election, and permitting that party to have access to the general election ballot in the same manner as a political body without requiring its members to resign their party membership.

The court found that providing the Consumer Party political body status for nomination purposes only was the most appropriate court-enforced remedy. The Consumer Party had not then attempted to use the political body nominating method but its availability as a solution was the underlying predicate to the court's refusal to enjoin Act 190 as unconstitutional. Although the court denied plaintiffs' motion for a preliminary injunction to prohibit the enforcement of Act 190 as to the Consumer Party, it retained jurisdiction to ensure that members of the Consumer Party had access to the general election ballot through the political body rather than the political party nominating procedure. However, nothing in the court's action was intended to effect a change in the then status of the Consumer Party as a political party. The defendants were enjoined from removing the Consumer Party name from the primary election ballot in the 1985 Spring Primary or preventing party members from voting by write-in or sticker.

However, the Court of Appeals concluded that the district court's chosen remedy was "of at least doubtful fidelity to the legislature's intent, contains serious vagueness problems, and may be unduly intrusive." 778 F.2d at 148. In setting aside the district court order, the Court of Appeals stated,

> The district court must, at all events, hold a final hearing at which the parties will develop a fuller record and, perhaps, suggest a better solution.[15] As the primary election machinery will soon come into gear, we expect that the district court will immediately commence a hearing and make such factual findings as are necessary for a final order to be entered. Assuming that its earlier constitutional findings are not at issue—and neither party has challenged them on appeal—the district court would then select an appropriate remedy.

778 F.2d at 148 (footnote omitted).

Accordingly, this court ordered that the evidence presented at the hearing on preliminary relief would be incorporated into the record for purposes of final judgment and scheduled a further evidentiary hearing and final argument. All of the parties originally declined the opportunity to present additional evidence at the final hearing. At the insistence of the court, because the original hearing was confined almost exclusively to the Consumer Party's problems incident to the 1985 Spring Primary in Philadelphia County, plaintiffs offered brief testimony on the state-wide impact of Act 190 and the defendants offered current party registration figures. Plaintiffs called plaintiff Max Weiner to testify briefly on the Consumer Party's current registration and ability to nominate candidates outside of Philadelphia. Plaintiffs also referred to registration figures submitted by exhibit at the hearing on preliminary relief, now incorporated as evidence for purposes of a final adjudication.

Plaintiffs then proposed that the court make findings of fact and conclusions of law as set out in the district court opinion: *Consumer Party v. Davis*, 606 F.Supp. 1008, 1010–20 (E.D.Pa.1985). Defendants, contrary to the assumption of the Court of Appeals, refused to concede the unconstitutionality of Act 190, even as to the Consumer Party, but they offered no evidence or argument sufficient to convince the court that Act 190 is constitutional as applied to the Consumer Party.

### Findings of Fact

Plaintiffs, the Consumer Party and several of its officers, candidates and members, seek preliminary and permanent injunctive and declaratory relief prohibiting the enforcement of Act 190 of 1984, 25 P.S. § 2872.1, against the Consumer Party.

Plaintiffs contend that the challenged state legislation, substantially increasing the number of signatures required to nominate candidates in the primary election, unconstitutionally deprives the Consumer Party of the right to participate in elections.

Defendants City and Commonwealth have responded that the Consumer Party has or will have a sufficient number of

registered party members to place candidates for primary nomination in the Consumer Party name or to write them in on the primary ballot; if the number of registered party members is insufficient for these purposes, defendants state that Consumer Party members and supporters can write-in their preferred candidates on the general election ballot.

The Pennsylvania Election Code, 25 P.S. § 2600 *et seq*, establishes a two-tiered system of political associations for electoral purposes: political parties and political bodies. A state-wide political party is defined as an organization polling in the state as a whole, and in each of at least ten counties, not less than two percent of the largest entire vote cast for any state-wide candidate elected in the preceding general election, 25 P.S. § 2831(a); a political body is any other political association which nominates candidates for general elections. 25 P.S. § 2831(c). Any party or body, one of whose candidates polled at least five percent of the largest entire vote cast for any county candidate elected at either the general or municipal election preceding the primary, is a political party within that county. 25 P.S. § 2831(b).

As noted by the Court of Appeals,

> There are several advantages to party status. For example, parties, but not bodies, are listed on all voter registration forms. Parties can designate candidates by certification in special elections, whereas bodies must use the cumbersome signature-gathering process to nominate candidates for such elections. Parties also enjoy much more prestige in the eyes of the media and public. The most significant difference between par-

ties and bodies, however, is the method by which they nominate candidates for the general election.

778 F.2d at 142.

Political parties must nominate all their candidates for office at primary elections, 25 P.S. § 2862, at which only those registered as members of a political party may vote, 25 P.S. § 2832.[1] The candidates who win a party primary are that party's nominees for office at the next general election.

In order to qualify for a place on a party's primary ballot, a candidate must file a nomination petition signed by a requisite number of registered members of that party. 25 P.S. § 2868. These nominating petitions must be circulated by party members and each circulator must file an affidavit stating that each signer "signed with full knowledge of the contents of the petition." 25 P.S. § 2869. Although one signing a primary nominating petition must be a registered party member, a candidate need not be a party member unless he or she is seeking party office or selection as a party delegate to a nominating convention. 25 P.S. § 2868.

Title 25 P.S. § 2872, the predecessor to Act 190 of 1984, required, *inter alia*, primary nominating petitions to be signed by the following number of registered party voters:

| | |
|---|---|
| President and United States Senate | — 100 in each of at least ten counties |
| State-wide Office | — 100 in each of five counties |
| Representative in Congress and State Senator | — 200 |
| State Legislature | — 100 |
| City-Wide Office (first-class cities) | — 100 |

---

1. No voter has a constitutional right to vote in a party primary or sign a primary nominating petition, *American Party of Texas v. White*, 415 U.S. 767, 785 n. 17, 94 S.Ct. 1296, 1308 n. 17, 39 L.Ed.2d 744 (1974), and either a state or political party may non-arbitrarily restrict the ability of voters to influence the nominating procedure by requiring a "closed" primary permitting voting only by party members or nominating petitions signed only by party members. *See Democratic Party of the United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (party members have right to hold primary free from influence of non-members); *Swaney v. Alton*, 116 P.L.J. 109 (Cmwlth. Ct.1968) (party rules are binding upon its members). *But cf., Republican Party of State of Connecticut v. Tashjian*, 770 F.2d 265 (1985), cert. granted, sub nom., *Tashjian v. Republican Party of Connecticut*, —— U.S. ——, 106 S.Ct. 783, 88 L.Ed.2d 762 (1986) (statutory closed primary violates Republican Party's associational rights where party rules permit unaffiliated person to vote in certain primary elections).

Act 190 of 1984 substantially increases the required number of valid registered party members' signatures on nominating petitions:

| | | |
|---|---|---|
| President and United States Senators | — | 2,000 |
| Governor | — | 2,000, including at least 100 from each of ten counties |
| Other State-Wide Offices | — | 1,000, including at least 100 from each of five counties |
| Representative in Congress | — | 1,000 |
| State Senator | — | 500 |
| State Legislature | — | 300 |
| City-Wide Offices (first-class cities) | — | 1,000 |

Signatures must be gathered during a three-week period beginning the thirteenth Tuesday before the primary and ending the tenth Tuesday before the primary (since this year's primary will be held on May 20, 1986, this period is from February 18—March 11, 1986). 25 P.S. § 2868.

Primary nominees may also be selected by write-in votes. But write-in votes may not be certified for a candidate unless the total number of votes for that person is equal to or greater than the number of signatures required on a nomination petition for the particular office in question. 25 P.S. § 3155.

Political bodies may not use the primary election machinery for nomination of their candidates. Instead, a political body candidate is nominated directly for the general election ballot by submitting to the Secretary of the Commonwealth nomination papers containing a requisite number of signatures of qualified electors (regardless of party affiliation) in the electoral district where that individual is running for office. 25 P.S. § 2911(a). For state-wide offices, the number of signatures required is at least two percent of the largest entire vote cast for any elected state-wide candidate in the last preceding election. 25 P.S. § 2911(b). For non-state-wide offices, the number of signatures required is at least two percent of the largest entire vote cast in that electoral district for any officer,

except a judge of a court of record, in the last preceding election. 25 P.S. § 2911(b). These signatures must be obtained during a period between the tenth Wednesday prior to the primary and the second Friday subsequent to the primary (March 12—May 30, 1986), 25 P.S. § 2913(b).

A political body candidate may, but need not be, a member of the political body nominating the candidate; a candidate may also be unaffiliated or independent. Multiple candidates for the same office representing the same political body are prohibited. The Secretary of the Commonwealth or any county board of elections is required to reject nomination papers if:

> the appellation set forth therein is identical with or deceptively similar to the words used by any existing party or by any political body which has already filed nomination papers for the same office, or if the appellation set forth therein contains part of the name, or an abbreviation of the name or part of the name of an existing political party, or of a political body which has already filed nomination papers for the same office.

25 P.S. § 2936.

However, a political body candidate cannot be a registered member of any party during the time beginning thirty (30) days before the primary and extending to the general or municipal election. 25 P.S. § 2911.1. Therefore, a candidate seeking nomination by a political body must file an affidavit stating that "he was not a registered and enrolled member of a party thirty (30) days before the primary held prior to the general or municipal election in that same year." 25 P.S. § 2911(e)(6). This "sore loser" provision has been described as a "laudable effort" to prevent disappointed candidates from bolting their party on the eve of, or after losing a primary election, and forming new political entities for the purpose of securing ballot access. *In re Owens,* 62 Pa.Cmwlth. 281, 436 A.2d 260, 262 (1981).

Political parties and political bodies also have different methods of nominating candidates for special elections. Political par-

ties may nominate their candidates as provided by party rules; no nominating petition signatures are required. 25 P.S. § 2776 *et seq.* However, political bodies may nominate such candidates only by filing signed nomination papers. *Id.* Both parties and bodies are permitted to make substitute nominations in case of death or withdrawal of any candidate nominated for general or special election. 25 P.S. §§ 2784, 2939, 2940.[2]

The Pennsylvania Consumer Party is an outgrowth of a consumer organization founded by Max Weiner and others in Philadelphia in 1965. This organization sought to redress consumer grievances that were inadequately addressed by any existing governmental agency. In 1967, organization members, believing their goal of reducing consumer abuse in the marketplace would be promoted most effectively through political action, formed the Consumer Party.

For some time thereafter, the Consumer Party was a political body and nominated candidates for general election by securing the requisite number of signatures on nominating papers as required by the Pennsylvania election laws. While the Consumer Party's candidates were unsuccessful in winning office, the Consumer Party provided a vehicle for political debate and promoted women and minority candidates.

The Consumer Party achieved (and has retained)[3] party status in Philadelphia County in 1976, in Allegheny, Beaver and Centre Counties in 1980, and state-wide in 1982; it has since been included on the primary ballot as a party.

In 1977 the Consumer Party lacked sufficient registered members to obtain the nec-essary number of signatures to place candidates on the primary ballot under 25 P.S. § 2872 (the predecessor to Act 190). But the Consumer Party increased its membership sufficiently so that at that primary election it nominated a candidate by write-in votes.

Subsequent to that election and until the passage of Act 190, the Consumer Party had sufficient registered members to comply with the signature requirements of 25 P.S. § 2872 and nominate candidates in the primary. But Act 190 has made it impossible either absolutely (where the number of signatures required by Act 190 is more than the total number of registered party members) or practically (where the number of signatures required is an extremely high percentage of registered party members) for the Consumer Party to obtain enough signatures to put its candidates on the primary ballot.

As of November 6, 1984, the number of Consumer Party members state-wide was estimated at only 3,886 as compared to 2,487,652 registered Republicans and 3,380,675 registered Democrats. There were 1,438 registered Consumer Party voters in Philadelphia County, the area where the Consumer Party has its strongest representation, and 436 registered Consumer Party members in Allegheny County. In no other county did the number of registered Consumer Party voters exceed 300 and the number of registered Consumer Party voters exceeded 100 in only eight counties other than Philadelphia and Allegheny. (Plaintiffs' Exhibit 2).

As of the election held November 30, 1985, the number of Consumer Party registrants state-wide was 5,928; the number of

---

**2.** With the obvious exception of the newly enacted Act 190, many of these provisions of the Pennsylvania election laws have previously been found to withstand federal and/or state constitutional scrutiny. *See, e.g., In re Owens,* 62 Pa.Cmwlth. 281, 436 A.2d 260 (1981) (upholding "sore loser" thirty-day disaffiliation requirement); *Salera v. Tucker,* 399 F.Supp. 1258 (E.D. Pa.1975), *aff'd,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) (upholding signature requirements for independent candidates but striking requirement that signatures be obtained during period ending 218 days prior to the general election); *Shankey v. Staisey,* 436 Pa. 65, 257 A.2d 897 (Pa.S.Ct.1969) (upholding 25 P.S. § 3155 requiring minimum number of write-ins for certification).

**3.** Because determinations of which political associations qualify for party status are made after every general or municipal election, an organization's status as a party or body may change from year-to-year.

Consumer Party registrants on December 13, 1985 in the City of Philadelphia was 3,494.

The Philadelphia Voter Registration Statistics dated November 4, 1985 (PF–1) were given ward by ward. However, Max Weiner's unchallenged opinion, based on his extensive experience in campaigning for the Consumer Party, was that the Consumer Party would have in only one or two legislative districts in the City 300 or more registered voters (and then not very many more than 300) so that to comply with the present requirements for nominating candidates for the legislature would require the signatures of practically 100% of the Consumer Party members. As far as the legislative districts outside the City of Philadelphia, the Consumer Party does not have any single district in which it has sufficient registered members to qualify to run a candidate.

Whether the 1984 state-wide figure of 3,886 registered members or the 1985 state-wide figure of 5,928 registered members is considered, the requirement of at least 2,000 signatures for national offices and Governor and 1,000 signatures for other state-wide offices makes it extremely difficult or impossible for the Consumer Party to nominate for these offices as well.

When this action was filed in February, 1985, there were in Philadelphia County, 1,467 registered Consumer Party members as compared to 867,967 registered Democrats, 198,411 registered Republicans, and 26,896 registered either as Independents or as members of another political association. Thus, while a candidate for city-wide office in Philadelphia would have required one-tenth of one percent of Democratic party-member signatures or write-in votes for nomination, he or she would have required 69% of the signatures or write-in votes of Consumer Party members. The number of Consumer Party registrants has more recently increased to 3,494, so that the signatures of only 28.6% of its members would

be required. But this is far in excess of the percentage requirement for the major political parties and it would still be difficult if not impossible to secure the requisite number of signatures on nominating petitions. "[P]arty members may be geographically dispersed or not at home when those circulating the petition arrive." 778 F.2d at 144 n. 7.

The Democratic ballot for the Special Primary Ballot of May 15, 1979 listed 101 candidates for Councilman-at-Large; the May 15, 1983 Municipal Primary and Special Election ballot listed 299 candidates for Judge of the Court of Common Pleas. (Each voter could vote for 39 of these candidates.)

Government witness Frederick L. Voigt, Executive Secretary of the Committee of 70, a civic organization, testified that voters have complained about the length and complexity of ballots, as well as the long wait to use voting machines and their frequent breakdowns.

There is no evidence that the legislature had the illegitimate motive of invidiously discriminating against the Consumer Party. The legislature's debates reflect only a desire to limit frivolous candidates and reduce voter confusion.[4] Representative Street, for example, stated that "[t]he [then-existing] low threshold, like 100 merely encourages frivolous candidates; it encourages incumbents to drum up candidates to clutter the ballots; it encourages many of the petty practices for which we in politics are criticized."[5] During this September 26, 1984 debate, the House defeated three proposed amendments to Senate Bill 387 (which became Act 190) to moderate the increase in required signatures without making any reference to the likely impact the higher requirements would have on small parties.[6]

Act 190 effectively denies the Consumer Party the opportunity to participate in party primaries (national, state and local) and,

---

4. Legislative Journal—House (September 26, 1984 at pp. 2015–17).

5. *Id.*

6. *Id.*

because a party nominates only by primary, it bars the Consumer Party from access to the general election ballot.

### Discussion

■ Numerous Supreme Court opinions considering the validity of laws regulating ballot access make clear that voters, political parties,[7] and, to a lesser extent, candidates have protected constitutional rights. The right to vote in a general election is a "fundamental political right ... preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). State laws which restrict the franchise, such as durational residency or pre-election registration requirements, are subject to strict scrutiny. *See Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The right to form political associations derives from the First Amendment guarantee of rights to freedom of speech, petition for redress of grievances, and peaceable assembly. *See Cousins v. Wigoda*, 419 U.S. 477, 487, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975) (party and its supporters have constitutional right of political association). This country's representative and elective system of government necessitates that "a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections." *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 26 (1973).[8]

■ Since voters can express their political preferences only through candidates, whether party members or independent, ballot access is intertwined with the rights of voters and entitled to protection. *See Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974) (invalidating state law denying candidacy to one unable to pay a filing fee). Laws which restrict ballot access by imposing party and candidate qualifications must be able to pass constitutional challenge on two related grounds: first, that rights of political association and voting are not impermissibly burdened in violation of the First and Fourteenth Amendments; and second, that small political parties and their members and candidates are not discriminated against in violation of the Equal Protection Clause of the Fourteenth Amendment.

Over the past two decades, the Supreme Court has frequently addressed the applicable standard of review for ballot access restrictions. Though endorsing at times both the strict scrutiny and rational relationship tests,[9] the Court now recognizes

7. In discussing federal authority, unless otherwise stated, the term political party refers generally to any political association or organization dedicated toward promoting particular views and candidates. In discussing the Pennsylvania election laws and their application, the term political party will continue to be used more narrowly to refer to a political association which does have sufficient demonstrated electoral appeal to qualify for the privilege and obligation of holding primaries in contrast to a political body which does not.

8. Though any individual's personal right to candidacy is not itself a fundamental right, *see Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), a critical ingredient of the electorate's ability to vote effectively is choice among candidates with demonstrated support. For this reason, everyone unaffiliated with a political party must be free to seek a place on the general election ballot provided that he or she is able to demonstrate some level of voter support (in order to protect the state's compelling interest in non-frivolous candidacies and uncluttered election ballots). "[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer v. Brown*, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 174 (1974). The ability of voters to write-in a candidate's name is not an adequate substitute for actually appearing on the ballot because "[t]o force a candidate to rely on write-ins is to burden him with disability. It makes it more difficult for him to get elected, and for the voters to elect him." *Williams v. Rhodes*, 393 U.S. 23, 37, 89 S.Ct. 5, 14, 21 L.Ed.2d 24 (1968) (Douglas, J., concurring).

9. *See Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (strict scrutiny standard); *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (rational relationship test); *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) and *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (applying mix of strict and minimal scrutiny; and *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)

that, "constitutional challenges to specific provisions of a state's election laws [cannot] be resolved by any litmus-paper test that will separate valid from invalid restrictions." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) (upholding disaffiliation requirement and remanding to district court to determine whether five percent signature requirement from restricted pool of eligible signers was unconstitutional).

In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), holding Ohio's early filing deadline unconstitutionally denied John Anderson a place on the general election ballot, Justice Stevens for the Court [10] announced a pragmatic multi-factor balancing test to be applied in ballot access cases:

> It [the Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy

and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. Although the *Anderson* Court considered only a First Amendment violation, it relied on prior election cases resting on the Equal Protection Clause. *Anderson*, 460 U.S. at 786–87 n. 7, 103 S.Ct. at 1568–69 n. 7. The Court did not overrule other ballot access cases but deemed its prior results correct under the balancing test that is now required.[11]

Restrictions upon access to the primary ballot raise constitutional issues similar to those in general election ballot access cases and require this same legal analysis.[12] *See Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1180–81 (1975). *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), is presently the Supreme Court's most comprehensive decision regarding state nominating procedures.[13] The Court there ex-

---

(limiting strict scrutiny to classifications based on wealth and those making it virtually impossible for any but the two major parties to achieve ballot positions). *See generally* L. Tribe, *American Constitutional Law* § 13–20 (1978); *Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1130–44 (1975).

**10.** Though Justice Rehnquist joined by Justices White, Powell and O'Connor dissented, they did not take issue with Justice Stevens' balancing test, 460 U.S. at 806, 103 S.Ct. at 1579 (Rehnquist, J., dissenting).

**11.** However, the dissenting opinion questioned the continuing authority of *Storer* in light of the Court's decision. *See Anderson*, 460 U.S. at 811–19, 103 S.Ct. at 1581–86 (Rehnquist, J., dissenting) (finding "obvious" similarities between the effect of the Ohio filing deadline and the California disaffiliation statute).

**12.** This same analysis may also apply to special elections. *See Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (holding political subdivision's five percent signature requirement for independent candidates and new political parties violative of the Equal Protection Clause

insofar as it required more than the 25,000 signatures required for candidates to appear on state-wide ballots).

**13.** The Supreme Court recently noted probable jurisdiction of *Munro v. Socialist Workers Party*, — U.S. ——, 106 S.Ct. 783, 86 L.Ed.2d 761 (1986); the question presented is whether a state statutory requirement that a candidate for political office must receive one percent of votes cast for that office in the primary election in order to appear on the general election ballot violates the First and Fourteenth Amendments. The court below, applying the balancing test of *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), held that it did; *Socialist Workers Party v. Secretary of State of the State of Washington*, 765 F.2d 1417 (9th Cir.1985).

Probable jurisdiction has also been noted in *Tashjian v. Republican Party of the State of Connecticut*, — U.S. ——, 106 S.Ct. 783, 88 L.Ed.2d 762. The court below held unconstitutional a Connecticut statute prohibiting voters unaffiliated with any political party from voting in party primary elections where the state Republican Party sought to permit unaffiliated vot-

amined Texas' electoral scheme providing four alternative methods for securing a place on the general ballot (required primary elections for the larger political associations, conventions and petition drives for the smaller) and recognized the strong state interest in regulating the number of candidates on the primary ballot. *American Party*, 415 U.S. at 782 n. 14, 94 S.Ct. at 1307 n. 14. *See Lubin*, 415 U.S. at 712–13, 94 S.Ct. at 1318 (noting state interest in limiting the size of the ballot to "minimize voter confusion," "curb ballot flooding," and "prevent the overwhelming of voting machines"). Based on a factual analysis of candidates' past experience in achieving primary ballot access as well as the "obvious differences in kind" between large and small or new parties, *see Jenness v. Fortson*, 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971), the Court held the burdens on the associational and equal protection interests of smaller parties were there outweighed by the state's vital interest in limiting the size of the ballot to ensure the integrity of its electoral process.

The Supreme Court also relied on a multi-factor balancing analysis in *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). A three-judge district court had relied on the Supreme Court's summary affirmance in *Salera v. Tucker*, 399 F.Supp. 1258 (E.D.Pa.1975), *aff'd*, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) (upholding signature requirements for independent candidates but striking requirement that signatures be obtained during 21-day period ending 218 days prior to the general election), in holding Maryland's early filing deadline unconstitutional as applied to independent candidates. The Supreme Court reversed and remanded because the district court had failed to make its own independent examination of the merits in light of evidence that during the years in which the Maryland filing deadline

was in effect, no independent candidate for state-wide office had ever succeeded in qualifying for the ballot. The trial court was required to make findings with regard to the burden on ballot access and the extent to which other features of the Maryland electoral system moderated that burden to determine, in the light of past experience, whether the burden on independent candidates' ballot access was unconstitutional. It is clear that the constitutional standards must be applied on the totality of facts of record.

■ Therefore, to resolve the constitutional problems potentially posed by the enactment of Act 190, we must apply the Supreme Court's *Anderson* test. We begin by exploring the character and magnitude of the injury to the Consumer Party caused by Act 190. The first issue is whether this Act alone unconstitutionally denies ballot access if those that Act 190 effectively prohibits from the party primary have a reasonable alternative route to the general election ballot. On finding that Act 190 itself is constitutional, the next issue is whether the Act's interaction with the remainder of the Pennsylvania Election Code produces an unconstitutional result in fact by denying reasonable alternative access to the general election ballot.

Prior to the enactment of Act 190, there were two requirements for access to a primary ballot: first, a political association had to meet the definition of a party by polling the requisite number of general election votes state- and county-wide; second, a party had to demonstrate that a proposed party candidate had a sufficient modicum of party support by obtaining a specified number of signatures. The constitutionality of this prior scheme is not in doubt.

Act 190 increases the number of party members' signatures required to place a candidate's name on the primary ballot.

---

ers to participate in certain primary elections; it also held that Art. I, § 2 and the Seventeenth Amendment do not apply to political party primaries, that Article I, § 4 does not require congressional elections procedures to comport with those employed in administrative state elec-

tions, and that the closed primary law violated rights of political association and was not justified by the state's interest in preventing raiding and avoiding comparison among voters. *Republican Party of the State of Connecticut v. Tashjian*, 770 F.2d 265 (2d Cir.1985).

With regard to the major parties, the requirement imposes a *de minimus* burden. One thousand signatures (the number required for most state-wide offices) represents far less than one percent of the total number of registered Democrats or Republicans. With regard to the Consumer Party, Act 190's requirements are far more onerous; the Consumer Party would likely be barred from most primary ballots.

■ But assuming that Consumer Party candidates have alternative routes to the general election ballot, the actual impact of Act 190 on the constitutional rights of those claiming to be effectively disenfranchised by it is not great. There is no constitutional right to primary participation. *See American Party*, 415 U.S. at 781, 94 S.Ct. at 1306. The Supreme Court has upheld substantially more burdensome restrictions than Pennsylvania's where there were alternative methods of nominating candidates similarly protective of an organization's associational and equal protection interests. *See Jenness*, 403 U.S. at 439, 91 S.Ct. at 1974 (upholding Georgia's political body and independent signature requirements; no challenge to aspect of law defining political parties as organizations receiving at least 20% of the vote at the most recent presidential or gubernatorial election and allowing only political parties to hold primaries).

The Supreme Court stated in *American Party*, "[a]ppellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to chose their candidates by primary elections." *American Party*, 415 U.S. at 781, 94 S.Ct. at 1306.[14] The Court

concluded that Texas' four-tiered scheme for obtaining access to the primary ballot, "affords minority political parties a real and essentially equal opportunity for ballot qualification. Neither the First and Fourteenth Amendments nor the Equal Protection Clause of the Fourteenth Amendment requires any more." *Id.* at 788, 94 S.Ct. at 1309.

But in a footnote to *American Party*, the Supreme Court noted:

At oral argument, counsel for appellants maintained that the Texas legislature raised the automatic ballot qualification figures to 20% after the La Raza Unida Party gubernatorial candidate polled more than 2% of the total vote in the 1972 general election. Counsel further intimated that the law will be changed again should a minority party fulfill the new requirements. Whatever their merits, we do not reach these contentions.

*American Party*, 415 U.S. at 772 n. 4, 94 S.Ct. at 1302 n. 4. In *Anderson*, the Supreme Court stated that "because the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decision making may warrant more careful judicial scrutiny." 460 U.S. at 793 n. 16, 103 S.Ct. at 1572 n. 16.[15]

Here there is no evidence that the legislature was motivated to discriminate against the Consumer Party, but the legislature in effect deprived the Consumer Party of its recently acquired status as a party with a primary. Therefore, this burden on the Consumer Party's constitutional rights

---

**14.** The same reasoning applies if the small party must proceed by general election nominating petitions. Nomination by primary election may actually be more not less burdensome for small parties than nomination by convention or petition. *See Jenness*, 403 U.S. at 438, 91 S.Ct. at 1974 (praising Georgia for not imposing upon a small or new party "the Procrustean requirement of establishing elaborate primary election machinery.")

**15.** The Court cited J. Ely's book, *Democracy and Distrust: A Theory of Judicial Review* 73–78 (1980), which sets forth a motive based test of

constitutional analysis. According to Ely, where a legislature acts to withhold a constitutionally gratuitous benefit that it had previously provided, a judicial analysis of the legislature's motivation is appropriate. *Id* at 145. *See also Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (holding First Amendment violated by Ohio law requiring disclosure of contributors to and recipients of minor parties' campaign funds where such disclosure might subject those identified to the "reasonable probability of threats, harassment or reprisals").

must be balanced against the vital state interest in alleviating ballot clutter and reducing voter confusion must be balanced against this burden on the Consumer Party's constitutional rights. *See American Party*, 415 U.S. at 782 and n. 14, 94 S.Ct. at 1307 n. 14.

If Act 190 effectively deprives the Consumer Party of party status for purposes of nominating candidates,[16] this law is constitutional as to the Consumer Party only if there exists a reasonable alternative means for Consumer Party candidates to reach the general election ballot. Under the *Anderson* test, the totality of the Pennsylvania Election Code, including Act 190, must be analyzed to determine the constitutionality of the entire electoral scheme.

> The concept of 'totality' is applicable ... in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.

*Storer*, 415 U.S. at 737, 94 S.Ct. at 1282. Such "impermissible barriers" consist of restrictions on the Consumer Party's access to the general election ballot.

The totality of the Pennsylvania Election Code results in the following: a political party must nominate by primary for local, state and national elections. If Consumer Party candidates fail to obtain a sufficient number of signatures to comply with Act 190 (as they most surely would), the primary ballot would contain the Consumer Party name but no candidates would be listed. Candidates could be nominated in the primary election only if the Consumer Party registered enough new members to produce a sufficient number of write-in votes. In the likely event that this method failed to produce Consumer Party nominees, the general election ballot would list the Consumer Party name but no candidates. Voters would be able to write-in an individual of their choice on this ballot.

Alternatively, candidates seeking the support of Consumer Party members could circulate nominating petitions among all registered voters and gain a place on the general election ballot, but any such candidate would have to resign any party membership thirty (30) days prior to the primary election because the nomination papers could not be filed by the member of any existing party or on its behalf; 25 P.S. § 2911.1. Thus, this method prohibits general ballot access to candidates formally affiliated with the Consumer Party.

It is readily apparent that with the enactment of Act 190, the total Pennsylvania electoral scheme violates "the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (invalidating Ohio law making it virtually impossible for any but Democrats and Republicans to qualify for the general ballot). The right of association is impermissibly infringed by election laws that in effect require a political organization either to increase or decrease its membership to participate in elections. The Equal Protection Clause is also implicated because this infringement operates only on political organizations large enough to qualify for party status but too small to meet the signature requirements of Act 190.

■ To avoid this effective bar from the electoral process, the Consumer Party has very limited forms of redress: it can either encourage voters to register in the Consumer Party or discourage votes cast for it in the general election and regain political body status. Each of these "forced" options violates the associative rights of a group of people joined together to further a particular purpose. A party may not be essentially required to broaden its message

---

**16.** The Consumer Party would retain party status for other purposes, including listing on voter registration cards, general election ballots and primary ballots. But the latter would include only the party name; no candidates would be listed. There would exist the possibility of primary nomination through write-ins if the Consumer Party were able to increase its membership sufficiently. *See* 25 P.S. § 3155.

or appeal in an effort to increase its membership; a group's associative rights depend on having as members only those who share a particular vision and collective purpose. *See, Fraenzl v. Secretary of Commonwealth of Pennsyvlania*, 83 Pa. Cmwlth. 539, 478 A.2d 903, 906 (1984) ("Indeed, were such an affirmative duty to seek registration of party supporters imposed by the [Election] Code, we doubt that it would pass constitutional muster.") Furthermore, even if the Consumer Party tries to increase its membership, it is exceedingly difficult, as organizer Max Weiner testified, to persuade voters to register in a small party and forego the political and patronage advantage of Democratic or Republican party membership. The court agrees with Mr. Weiner that Act 190 now places an impossible and therefore unconstitutional burden on the Consumer Party.

■ A political organization's First Amendment rights are impermissibly infringed if it must attempt to drive away general election voters in order to keep its general election vote under two percent and regain body status. Similarly, to require the Consumer Party's preferred candidates to run as unaffiliated with it violates the basic goal of political associations: the opportunity to choose and support party standard bearers. An unaffiliated candidate could support the views of the Consumer Party; however, because party identification is a critical aspect of American politics, required disaffiliation constitutes a "substantial restraint" and a "significant interference" with the exercise of constitutional rights. *Kusper*, 414 U.S. at 58, 94 S.Ct. at 308.

The state contends that the Consumer Party's status would be constitutionally protected because the Consumer Party name would appear on both the primary and general ballots and voters could write-in candidates of their choice. However, the Supreme Court has recognized the inadequacy of the write-in alternative.

> The realities of the electoral process, however, strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot.... [A candidate] relegated to [the] write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot.

*Lubin*, 415 U.S. at 719 n. 5, 94 S.Ct. at 1321 n. 5.

Having evaluated the nature and likely effect of the Election Code, as amended, on the Consumer Party, we now examine the Government's justifications for this scheme. Under the *Anderson* test, we "consider the extent to which those [state] interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. Admittedly, the state has a vital interest in ensuring the integrity of its elections and may rightfully require that potential candidates demonstrate a modicum of voter support. But in this instance, the nature of the burden on the Consumer Party's constitutional rights demands that the state's regulations be the least restrictive means of protecting this legitimate state interest.[17]

The Pennsylvania legislature could have protected its interest in ballot integrity without denying the Consumer Party's constitutional rights by ensuring that the Consumer Party did not fall into a no-man's-land between the nominating procedures required of a political party and those of a political body. As *American Party* makes clear, the legislature could treat the Consumer Party as either a party or a body for

---

**17.** This demand is, of course, comparable to the strict scrutiny standard. The *Anderson* balancing test requires a more compelling state interest to justify substantial restrictions on political parties' constitutional rights than is required to justify mild restrictions. *See Kusper,* 414 U.S. at 58–59, 94 S.Ct. at 308–09 ("... a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest.... For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." (citations omitted)). *See also,* Tribe *supra* note 8 at §§ 13–22.

nominating purposes. The Texas law upheld in *American Party* barred political organizations polling less than two percent of the total gubernatorial vote in the preceding general election from primary participation. But there the organizations could nominate candidates by convention and, if the required support was not evidenced at the conventions, by petition. *See American Party,* 415 U.S. at 774, 94 S.Ct. at 1302. Here Act 190 prevents the Consumer Party from nominating its party candidates by primary and 25 P.S. § 2911.1 prohibits it from naming its party members as candidates on the general election ballot. Therefore, the court finds that the individually valid provisions of the Pennsylvania election code operate together to produce an unconstitutional result.

With regard to remedy, at the final hearing, no party offered "a better solution." Plaintiffs persist in their contention that Act 190, in combination with other provisions of the Pennsylvania Election Code, is unconstitutional as applied to the Consumer Party and its candidates and proposes that as to it the former signature requirements of 25 P.S. § 2872 be reinstated by court order. The district court does not believe any court can reenact a statute repealed by the state legislature and certainly a federal court should not do so.

The state defendant suggested two alternatives for proposal to the legislature. The first would increase the number of votes that must be received at a general election in order to qualify as a political party rather than political body. Even if there would be no constitutional problem because this action would not be intended to restrict minor political movements but to deal with ballot clutter in general, it seems clear this solution cannot be imposed by a court. There is simply no legal guideline for selecting rationally any particular requisite number. The second solution would change the basis of the numerical requirement from votes cast at a general election to numbers of party registrants as of a date certain. Whatever merit this proposal may have for the legislature, there is no basis for court selection of any specific

number to be required. Each of the state's suggested solutions permit no fidelity to the legislature's intent and are far more intrusive than the district court remedy already invalidated by the Court of Appeals. The court also considered, *sua sponte,* a nominating signature requirement based on a percentage of party registrants instead of an absolute number. However, there is no legislative guidance on whether that requirement should be one percent or .1% and the court concludes that such a remedy would also be an impermissible intrusion upon state policy.

The Court of Appeals has clearly articulated the desirability of a legislative solution to the confusion created by its overlooking the effect of Act 190 on small parties; the Court of Appeals directed the Clerk to forward a copy of its opinion to the Governor's counsel, the Attorney General, and the majority and minority leaders of the Pennsylvania House and Senate, with a cover letter directing their attention to footnote 15, 778 F.2d at 148.

As the Court of Appeals stated, the primary election machinery will soon come into gear, so that a final order must be entered expeditiously. On balance, this court can do no more than invalidate the challenged statute at least as to the aggrieved party.

This remedy is not without disadvantage. Of all the political groups with political authority status under Pennsylvania law, the Consumer Party alone may nominate candidates in a Spring Primary without the showing of support implicit in the signature requirement. While unlikely, in theory, any Consumer Party member may now file as a candidate supported by five, or even less petitioners; this may lead to ballot clutter, at least as to the Consumer Party; but the legislature may constitutionally avoid this only if it does not make it difficult or impossible for the Consumer Party to place candidates on either the primary or general election ballot. There are methods of protecting Pennsylvania's legitimate interests without disenfranchis-

ing the Consumer Party; as it is, the individually valid provisions of the Pennsylvania Election Code operate together to produce an unconstitutional result as to the Consumer Party. Therefore, this court invalidates the challenged statute as applied to the Consumer Party and leaves the means by which the situation is corrected to the legislature. *See* 778 F.2d at 148 n. 16.

### Conclusions of Law

The foregoing constitutes the court's reasoning in support of the following conclusions of law:

This court has jurisdiction over the action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(1), (3), and (4), and 2201.

█ The action has not been rendered moot because the elections (primary and general) that gave rise to the request for a preliminary injunction have now been held. 778 F.2d at 146 n. 12.

█ Abstention, argued for by the defendants, is inappropriate. Abstention is proper only where a statute may be interpreted by the state judiciary in a way that would avoid the necessity of reaching a federal constitutional issue. *Kusper v. Pontikes*, 414 U.S. 51, 54–55, 94 S.Ct. 303, 306–07, 38 L.Ed.2d 260 (1973). Since Act 190 is clear on its face (and defendants offered no argument that another interpretation might be appropriate), "abstention would amount to shirking the solemn responsibility of the federal courts to guard, enforce and protect every right granted or secured by the Constitution of the United States." *Kusper*, 414 U.S. at 55, 94 S.Ct. at 306 (citations omitted).

Act 190, in combination with other provisions of the Pennsylvania Election Code, is unconstitutional as applied to the Consumer Party and its members because it makes it effectively impossible for the Party to place candidates on the general election ballot.