May 25, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2026

LIBERTARIAN PARTY OF MAINE, ET AL.
Plaintiffs, Appellants,

v.

G. WILLIAM DIAMOND, ETC.,
Defendant, Appellee.

No. 92-2061
LIBERTARIAN PARTY OF MAINE, ET AL.
Plaintiffs, Appellants,

v.

G. WILLIAM DIAMOND, ETC.,
Defendant, Appellee.

ERRATA SHEET

The opinion of this Court issued on April 30, 1993, is
amended as follows:

At p. 20, last line in text:

Add "et seq.," after " 301,"

Replace the current first sentence beginning on line 1,
p. 21, with the following: "Indeed, a party can choose to
'disqualify' itself at any time up to April 15 of an elec-
tion year, even after submitting the party designation and
consent of its 'coattail' candidate under 302(1), merely
by eschewing the municipal caucuses required by 302(3)."

Replace " 301" in line 7 of with " 302"

The first line in fn. 11 should read as follows:
"The April 15 caucus deadline occurs two weeks after
. . ."

Lines 9 and 10 in fn. 11 should read as follows:
"may choose simply by withholding the certification
of caucus participation under 302(3) to nominate
its candidates to . . ."

At p. 23, 2, l.2:

Replace " 301" with " 302"

At p. 24, l.10 in text:

Replace " 301(D)" with " 302(3)"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2026

LIBERTARIAN PARTY OF MAINE, ET ALS.,

Plaintiffs, Appellants,

v.

G. WILLIAM DIAMOND, ETC.,

Defendant, Appellee.

No. 92-2061

LIBERTARIAN PARTY OF MAINE, ET ALS.,

Plaintiffs, Appellants,

v.

G. WILLIAM DIAMOND, ETC.,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Hector M. Laffitte,* U.S. District Judge]

Before

Torruella and Cyr, Circuit Judges,

and Bownes, Senior Circuit Judge.

*Of the District of Puerto Rico, sitting by designation.

Glenn S. Eddy with whom Berman & Simmons, P.A. was on brief for

appellants.
Cabanne Howard, Deputy Attorney General, with whom Michael E.

Carpenter, Attorney General, was on brief for appellee.

April 30, 1993

2

CYR, Circuit Judge. The Libertarian Party of Maine
CYR, Circuit Judge.

("Party") and seventeen of its candidates for elective office

("appellant candidates") challenge a district court ruling

upholding the constitutionality of Maine's ballot-access require-

ments, 21-A M.R.S.A. 301 et seq. We affirm.

I

Under Maine law, a group of voters seeking recognition

as a new political party may "qualify" in either of two ways.

First, the voter group may petition the Secretary of State to

participate as a political party in the primary election; the

petition must be signed by voters numbering at least 5% of the

votes cast in the preceding gubernatorial election. See 21-A

M.R.S.A. 303(1). Second, the group may organize a political

party around a prior candidate for the office of Governor or

President who (1) was not affiliated with a registered party;

(2) consents in writing; and (3) received more than 5% of the

total Maine vote cast for the office of Governor or President, as

the case may be, in the immediately preceding gubernatorial or

presidential election. See id. at 302(1). A party which

organizes itself under 302(1), on the "coattails" of a prior

independent candidate for office, need not demonstrate contem-

poraneously the level of voter support defined in 303(1), but

the party's candidates remain subject to the numerical voter-

support requirements for later listing on the general election

ballot. See id. at 304.

3

Party recognition entails certain benefits, including

public exposure, the prestige of "official" status, automatic

listing of the party's presidential candidate on the election

ballot, see id. at 331(2)(A), and the right to raise funds by

means of a special check-off box on the Maine income tax form.

See 36 M.R.S.A. 5283. With these benefits come certain respon-

sibilities, including the obligation to hold municipal caucuses

during election year, 21-A M.R.S.A. 301(1)(A), 311; to hold a

biennial state convention, id. at 301(1)(B), 321; and to

nominate candidates for office through a primary election pro-

cess, id. at 331(1). The primary election process is intended

to control "ballot clutter" by ensuring that each political party

nominates only one candidate for any particular office, and that

the party nominee possesses the prescribed levels of support

within his or her party and the general electorate. See Opinion

of Justices of the Supreme Judicial Court, 578 A.2d 183, 186 (Me.

1990).

To qualify for the primary election ballot, a party

candidate must present the Secretary of State, not later than

April 1, with a petition signed by enough enrolled party members

to demonstrate the level of party support prescribed for the par-

ticular "electoral division" to which the candidate seeks elec-

tion. Id. at 335(5). The required levels of petition support

are shown in Table I.

4

TABLE 1

Number of Signatures Required to Qualify For
Primary Ballot (Registered Party Candidates)*

President of the United States 2000 signatures
United States Senator 2000 signatures
State Governor 2000 signatures
United States Representative 1000 signatures
County offices
(other than County Commissioner) 150 signatures
State Senator 100 signatures
County Commissioner 50 signatures
State Representative 25 signatures

* Signatures may come only from enrolled members of
prospective candidate's party.

-

A party candidate who does not obtain the signatures required to

qualify for the primary election ballot may still qualify for the

general election ballot by winning a plurality of the party's

primary election write-in vote. Id. at 723(1)(A). The write-

in voting process is not restricted to members of the candidate's

political party, but is open to any registered voter who is

eligible to participate in the party primary. Id. at 340. On

the other hand, a successful write-in candidate must obtain votes

totalling twice the number of signatures which would have been

required to qualify for listing on the primary ballot under

335(5). See id. at 723(1)(A).

5

-

TABLE II

Number of Signatures Required to Qualify For
General Election Ballot by Nomination Petition *
or by Write-In Vote in Party Primary **

Presidential elector 4000 signatures
United States Senator 4000 signatures
Governor 4000 signatures
United States Representative 2000 signatures
County office
(other than County Commissioner) 300 signatures
State Senator 200 signatures
County Commissioner 100 signatures
State Representative 50 signatures

* Signatures may come from any registered voter
regardless of party affiliation.

** Write-in votes may come from any registered voter
whom the party declares eligible to participate in the
party's primary (including independent voters).

-

Candidates who are not enrolled in a "qualified" party,

or who withdraw their party affiliation at least three months in

advance, see id. at 353, may qualify for Maine's general

election ballot through a third process, a nomination petition.

Id. at 351. The nomination petition must bear the names,

signatures and addresses of enough registered voters, regardless

of party affiliation, to meet the prescribed level of support for

the particular "electoral division" to which the candidate

aspires. Id. at 354(1)-(2). Generally speaking, the number of

signatures required on a nomination petition for any particular

office is the same as that required for a write-in candidate to

6

qualify at a party primary, see Table II, supra; and totals twice

the number of signatures a party candidate would be required to

obtain on a primary petition. See id. at 354(5). A prospec-

tive candidate may list a party name (or "political designation")

of up to three words on the nomination petition, id. at 354(1),

and on the general election ballot if s/he qualifies. Id. at

602(B).

II

For some time, the Libertarian Party has participated

in Maine elections, apparently without achieving the level of

voter support needed to qualify as an official political party

under 303.1 In January 1991, however, Andrew Adam, an inde-

pendent candidate who won 9% of the vote in the 1990 Maine guber-

natorial election, permitted the Party to use his name to bypass

the nomination-petition process and qualify automatically as a

political party under the "coattail" provisions of 302(1).

Following its certification as an "official" party, the Party

made diligent efforts to attract members. By the date of the

1In May 1984, the Party sought to place its presidential
candidates on the Maine ballot by means of a nomination petition,
but fell short of the 4000 signatures required under the statuto-
ry predecessor to 354. The Maine Supreme Judicial Court
rejected the Party's challenge to the signature requirement, and
denied the Party's motion to enjoin the Secretary to place the
candidates' names on the general election ballot. See Crafts v.

Quinn, 482 A.2d 825 (Me. 1984). In June 1990, the Party began an

organizing campaign to "qualify" as an official political party
under the 303 petition process, which apparently fell short of
the level of voter support required by 303(1).

7

primary election on June 9, 1992, it had enrolled 1,048 regis-

tered voters statewide, but did not have sufficient concentra-

tions of membership support to satisfy the signature requirements

under 335 for getting the appellant candidates on the primary

election ballots in their respective districts.2 The appellant

candidates participated as write-in candidates in the Party

primary, and in some instances won a plurality of the write-in

votes cast in their respective districts,3 but the total number

of their write-in votes was insufficient to qualify the appellant

candidates for the general election ballot under 723(1)(A).4

Anticipating its candidates' inability to qualify for

the general election ballot through the prescribed statutory

process, the Party amended its by-laws on May 17, 1992, to permit

2Two of the Party's candidates, Victoria Linne and Carleton
Mabee, did meet the signature requirements for listing on the
primary ballot for the office of State Representative. Both
received a plurality of votes in their respective districts in
the Party primary (Linne received 26 votes, Mabee received 2
votes), and both qualified for the November general election
ballot under 331. Neither is named as a party to this appeal.

3Some of the appellant candidates failed to obtain a plural-
ity of support in the Party primary. For example, Charles
Potratz, the candidate nominated at the Party convention to
represent Senate District 4, finished third in the District

primary (one write-in vote) behind Charles Webster and Dana White
(each with four votes). In Maine's Second Congressional Dis-
trict, the Party's nominated candidate, Paul Fichtner, finished
second (22 votes) to Olympia Snowe (30 votes).

4A total of 103 write-in votes were cast, for 23 candidates,
to determine the Party's nominees for Maine's two Congressional
seats. The poor showing occurred despite the fact that the Party
permitted independent voters as well as Party members to parti-
cipate in its primary. The Secretary of State represented at
oral argument that independent (unenrolled) voters make up
approximately one-third of the Maine electorate, i.e., approxi-

mately 300,000 voters statewide.

8

its candidates in the general election to be nominated at the

Party convention. Following their nomination, the names of the

appellant candidates were submitted to defendant-appellee,

Secretary of State William Diamond ("Secretary"), who declined to

place their names on the general election ballot, citing the

mandatory language of the Maine election code. See id. at

331(1) ("a party's nomination of a candidate for federal, state

or county office shall be made by primary election") (emphasis

added); 7 ("[w]hen used in this Title, the words 'shall' and

'must' are used in a mandatory sense to impose an obligation to

act or refrain from acting").

On August 10, 1992, the Party brought an action for

injunctive relief against the Secretary, challenging, inter alia,

the constitutionality of Maine's ballot-access restrictions.

Following an expedited hearing, the district court dismissed the

action. See Libertarian Party of Maine v. Diamond, 799 F. Supp.

1 (D. Me. 1992). We denied injunctive relief pending appeal, on

the ground that appellants had not shown a likelihood of success

on the merits of their constitutional claim. In the 1992 general

election, no Party candidate was elected to any state office.

The Party's presidential candidates, Andrew Marrou and Nancy

Lord, who were "automatically" listed on the general election

ballot, received approximately one-quarter of one percent of the

Maine popular vote.5

5Because the Party's presidential candidates failed to poll
the 5% voter support needed to maintain "official party" status,
the Secretary contends that the Party lost its standing as a

9

Reiterating their constitutional claims on appeal,

appellants note that a Party candidate may be denied access to

the general election ballot under the Maine election code, even

if s/he commands the support of a plurality of the voters partic-

ipating in the Party's district primary, unless s/he also shows

that the Party itself has sufficient support, in the particular

"qualified" party under Maine law, and that its constitutional
claim is moot. See 21-A M.R.S.A. 304 ("a party . . . is not

qualified to participate in a subsequent primary election unless
it meets the requirements of 301"); see also id. at 301(1)(C)

("a party qualifies to participate in a primary election if . . .
its candidate for Governor or for President polled at least 5% of
the total vote cast in the State for Governor or President in the
last preceding gubernatorial or presidential election"). We
reject the State's contention, for three reasons.
First, we do not assume that a party is in fact subject to
disqualification under 301(1)(C) where its candidates failed to
poll 5% of the total vote in the preceding presidential election,
but did succeed in polling the requisite 5% level of support in

the preceding gubernatorial election. As noted, Andrew Adam (who

subsequently allowed the Party to petition for "official" status
under his name) polled 9% of the vote in the 1990 gubernatorial
election, and the Party contends that this showing "will carry
the Party through the 1994 gubernatorial election," regardless of
its performance in the intervening Presidential race.
Second, and more important, it may be that the process of
disqualification under 304 is not automatic, as it appears to
require a formal determination by the Secretary, under 305,
that the Party has not met the requirements of 301(1)(C). To
our knowledge, the Secretary has made no such official deter-
mination. To the extent that such a determination is a prere-
quisite to party disqualification, the Party would retain its
standing, and the State's argument would be groundless.
Finally, in all events the Party's complaint is one which is
"capable of repetition, yet evading review." See Anderson v.

Celebrezze, 460 U.S. 780, 784 n.3 (1983); Democratic Party of

United States v. Wisconsin, 450 U.S. 107, 115 n.13 (1981); Storer

v. Brown, 415 U.S. 724, 737 n.8 (1974); Rosario v. Rockefeller,

410 U.S 752, 756 n.5 (1973); Dunn v. Blumstein, 405 U.S. 330, 333

n.2 (1972). So long as the challenged statutory scheme remains
in effect, the Party and other small parties may qualify for
"official" party status under 302; so long as they qualify
without the necessary support to meet the signature requirements
of 335(5), the possibility exists that they will be "shut out"
of ballot access, as alleged here.

10

electoral subdivision, to enable the candidate (1) to gather the

requisite signatures from Party members to qualify for the

primary ballot under 335(5); or (2) to qualify for the general

election ballot by obtaining sufficient voter participation in a

write-in election under 723(1)(A). Appellants assert that

these additional requirements are unnecessary and unconstitution-

ally burdensome, since the Party has already qualified, under 21-

A M.R.S.A. 302, as an organization possessing "statewide

support." Furthermore, appellants assert, if any additional

showing of support is necessary, the Party should be able to rely

on demonstrations of support from other voters outside the Party

ranks.

III

Limitations upon ballot access may impinge two funda-

mental constitutional rights: "the right of individuals to

associate for the advancement of political beliefs, and the right

of qualified voters, regardless of their political persuasion, to

cast their votes effectively." See Williams v. Rhodes, 393 U.S.

23, 30 (1968); see also, e.g., Munro v. Socialist Workers Party,

479 U.S. 189, 193 (1987); Illinois State Board of Elections v.

Socialist Workers Party, 440 U.S. 173, 184 (1979). Where ballot

access restrictions fall unequally on similarly situated parties

or candidates, the Fourteenth Amendment right to "equal protec-

tion of the laws" may be threatened as well. See Anderson, 460

U.S. at 786 n.7; Lubin v. Panish, 415 U.S. 709, 713-14 (1974);

11

Bullock v. Carter, 405 U.S. 134, 141 (1972); Williams, 393 U.S.

at 30-34. The Supreme Court has recognized, nevertheless, that

"as a practical matter, there must be substantial regulation of

elections if they are to be fair and honest and if some sort of

order, rather than chaos, is to accompany the democratic process-

es." Storer v. Brown, 415 U.S. 724, 730 (1974). This legitimate

interest in reasonable regulation is based not only on "common

sense," Burdick v. Takushi, 112 S.Ct. 2059, 2063 (1992), but also

on the Article I reservation to the States of the power to

prescribe "Times, Places, and Manner of holding Elections for

Senators and Representatives." U.S. Const., Art. I, 4, cl. 1.

Accordingly, courts have attempted a constitutional equilibrium

between the legitimate constitutional interests of the States in

conducting fair and orderly elections and the First Amendment

rights of voters and candidates, balancing

"the character and magnitude of the asserted
injury to the rights protected by the First
and Fourteenth Amendments that the plaintiff
seeks to vindicate" against "the precise
interests put forward by the State as justi-
fications for the burden imposed by its
rule," taking into consideration "the extent
to which those interests make it necessary to
burden the plaintiff's rights."

Burdick, 112 S.Ct. at 2063 (quoting Anderson, 460 U.S. at 789).

"Only after weighing all these factors is the reviewing court in

a position to decide whether the challenged provision is uncon-

stitutional." Anderson, 460 U.S. at 789.

A. "Substantial Support"

12

As the Supreme Court repeatedly has held, States have a

legitimate interest in "protect[ing] the integrity of the elec-

toral process" by ensuring that "all candidates for nomination

make a preliminary showing of substantial support" among voters

in the relevant electoral districts. Over the years, the Court

has articulated the "support" requirement in various ways, but

its broad outlines are clear. See, e.g., Munro, 479 U.S. at 193

("modicum of support among the potential voters for the office");

Anderson, 460 U.S. at 788-89 n.9 ("preliminary showing of sub-

stantial support"); American Party of Texas v. White, 415 U.S.

767, 782 (1974) ("significant, measurable quantum of community

support"); Lubin, 415 U.S. at 715 ("serious candidates with some

prospects of public support"); Jenness v. Fortson, 403 U.S. 431,

442 (1971) ("significant modicum of support"). The "support"

requirement is meant to safeguard the integrity of elections by

avoiding overloaded ballots and frivolous candidacies, which

diminish victory margins, contribute to the cost of conducting

elections, confuse and frustrate voters, increase the need for

burdensome runoffs, and may ultimately discourage voter partici-

pation in the electoral process. See Illinois State Board of

Elections, 440 U.S. at 183-84 (quoting Lubin, 415 U.S. at 715);

Bullock, 405 U.S. at 145. A State is permitted to consider a

party's primary-election performance as a relevant factor in its

measurement of "significant support." See, e.g., Munro, 479 U.S.

at 196-197 (upholding requirement that minor parties poll 1% of

participating electorate in primary election; observing that

13

"[t]he primary election . . . is 'an integral part of the entire

election process . . . [that] functions to winnow out and finally

reject all but the chosen candidates'"). "The State can properly

reserve the general election ballot 'for major struggles.'" Id.

(quoting Storer, 415 U.S. at 735).

The Party argues that its qualification as a political

party under the 302 "coattail" provision was enough to demon-

strate "substantial support" among the Maine electorate. We do

not agree. By choosing to qualify under the "coattail" provi-

sion, the Party bypassed the requirement of mustering significant

numerical support among eligible voters, rather than demonstrat-

ing its capacity to do so. As far as the record shows, the Party

has submitted no petitions, enrolled few members, and garnered

little support for the candidates who ran under its banner in the

1992 and earlier elections. Indeed, its only significant spon-

sorship to date has been the endorsement of Andrew Adam, whose 9%

showing in the 1990 gubernatorial elections may have suggested an

ability to interest independents in Party enrollment, but clearly

did not ensure that such support could or would be obtained. In

these circumstances, we think the State retained a legitimate

interest in ensuring that the Party in fact possessed a minimal

level of support among the electorate, as a prerequisite to

listing the appellant candidates on the primary and general

election ballots.6

6We believe the absence of any prior numerical showing of
support distinguishes this case from Tashjian v. Republican Party

of Connecticut, 479 U.S. 208 (1986), and Consumer Party v. Davis,

14

Moreover, even if we were to accept the Party's premise

that Adam's coattails invested the Party with some similitude

of "statewide support" more would be required. The Supreme

Court recently confirmed that a State possesses a separate, and

additional, interest in ascertaining that a political party which

nominates candidates for office in an electoral subdivision of a

larger political unit demonstrate support in the particular

electoral subdivision for which the candidate is nominated. See

Norman v. Reed, 502 U.S. , 112 S.Ct. 698, 708 (1992) (reject-

ing "overall" showing of support as basis for nominating local

candidate; "[a] Party [may not] cite its success in [one] dis-

trict as a sufficient condition for running candidates in the

[other]"). The Norman requirement makes sound electoral sense:

the potential for "confusion and frustration" when statewide

633 F.Supp. 877 (E.D. Pa. 1986), which the Party cites in its
briefs on appeal. In Tashjian, the Supreme Court invalidated a

state law prohibiting the participation of independent voters in
selecting convention-nominated candidates in a Republican Party
primary. But the Republican Party (with 425,695 registered
members) already had demonstrated a "significant modicum of
support" among the general voter population, under a legal
standard substantially stricter than Maine imposes. See id. at

211 n.2 (citing Conn. Gen. Stat. 9-372(5)(B) (1985)) (major
parties, eligible to participate in primaries, must have "re-
"
ceived . . . at least twenty per cent of the whole number of

votes cast for all candidates for governor" in the preceding
election). Clearly, in Tashjian the States retained little

compelling interest, prior to the challenged elections, in
reevaluating the Republican Party's "support." Likewise, in
Davis, a district court invalidated changes to Pennsylvania's

ballot-access restrictions that had the effect of "disqualifying"
a political party which (unlike the Party here) already had met

signature requirements for demonstrating "significant support,"
,
under an earlier version of the statute at issue. Although the
Davis court did not rely on the Consumer Party's preexisting

party status, that fact figures significantly in our evaluation
of its precedential weight in the circumstances of this case.

15

election ballots are overloaded with candidacies who lack even a

modicum of support among eligible voters poses similar risks in

local and district elections. As all appellant candidates sought

elective office at the local or district level, rather than

statewide,7 the State had a legitimate interest in ensuring a

modicum of candidate support among the relevant voter constituen-

cies, over and above any general support which might be imputed

to the Party based on Adam's "statewide" success in 1990.

B. Regulating Primary Participation

States possess a comparable interest in ensuring that a

party's nominating process includes sufficient participation by

the party's own members or supporters. Absent some level of par-

ticipation by party members, the integrity of party nominations

might be compromised by "party raiding," whereby "voters in

sympathy with one party . . . influence or determine the results

of another party's primary," Rosario, 410 U.S. at 761-62, which

in turn could threaten the integrity of general elections and

dilute the informative function of a party's label as a descrip-

tion of its collective political purpose. See Tashjian, 479 U.S.

at 220-21 (noting "informative function" of party labels as

"shorthand designation of the views of [the] party['s] candidates

on matters of public concern"); Rosario, 410 U.S. at 762 (noting

7Seven of the appellant candidates sought election in state
senate districts; eight in state representative districts; and
the remaining two as representative in each of Maine's two
congressional districts.

16

State's asserted interest in preventing primary votes which are

"not in sympathy with the party's principles").

Appellants correctly suggest that the Supreme Court, in

Tashjian, minimized the significance of the State's interest in

"attempting to act as the ideological guarantor of [a particular]

Party's candidates," 479 U.S. at 218, and reaffirmed its "faith

in the ability of individual voters to inform themselves about

campaign issues," id. (quoting Anderson, 460 U.S. at 796). In

arriving at this conclusion, however, the Court specifically

noted the state-law requirement that parties maintain a certain

level of support among the general electorate, see id. at 211

n.2, and that party candidates thereafter "garner substantial

minority support" at the Party's "closed" convention:

The Party is not proposing that independents
be allowed to choose the Party's nominee
without Party participation; on the contrary,
to be listed on the Party's primary ballot
continues to require, under a statute not
challenged here, that the primary candidate
have obtained at least 20% of the vote at a
Party convention, which only Party members

may attend.

Id. at 220-21 (emphasis added). In light of the Tashjian Court's

explicit reference to a "closed" nomination process, by a Party

possessing "substantial support" among the general electorate, we

do not think Tashjian signals a retreat from the position that

the State may impose reasonable safeguards to ensure active

participation by a significant number of a party's members or

supporters in the course of the nominating process.

C. Burden on Associational Interests

17

We next consider the burdensomeness of Maine's elector-

al scheme. Like all such schemes, Maine's ballot-access restric-

tions "inevitably affect[] at least to some degree the

individual's right to vote and his right to associate with others

for political ends." Anderson, 460 U.S. at 788. After carefully

examining the effects of Maine's nomination procedures, the

district court concluded that the challenged ballot-access

requirements were neither inappropriate to their purposes nor

unconstitutionally burdensome. We agree.

As the district court noted, the levels of electoral

support Party candidates are required to demonstrate in order to

get on the Party's primary ballot are not high:

The record shows that there are approximately
876,000 registered voters in Maine. In Maine
there are two Congressional seats, 35 state
senate seats, and 151 state representative
seats. If each electoral division has an
equal number of voters, then each Congres-
sional district would have approximately
438,000 voters, each state senate district
would have approximately 25,000 voters, and
each state representative district would have
approximately 5,800 voters. The requirements
for primary petition signatures for these
three districts are 1,000, 100 and 25, re-
spectively. Therefore, the numbers [of Party
members' signatures] that an aspiring Liber-
tarian candidate for each of these positions
would need amount to 0.22%, 0.4%, and 0.43%,
respectively, of the registered voters in
each district.

799 F. Supp. at 4. We endorse the district court's view that

these signature requirements indeed are modest in numerical

terms. Compare, e.g., American Party, 415 U.S. at 783 (upholding

requirement that 1% of voters in last gubernatorial election must

18

participate in minor parties' precinct conventions or sign

supplemental nominating petitions for statewide candidates; "[t]o

demonstrate this degree of support does not appear either impos-

sible or impractical, and we are unwilling to assume that the

requirement imposes a substantially greater hardship on minority

party access to the ballot"); see also Burdick, 112 S.Ct. at 2064

(1% of all registered voters for party participation in statewide

primary); Illinois State Board of Elections, 440 U.S. at 186

(25,000 signatures for statewide office); Storer, 415 U.S. at 740

(325,000 signatures statewide in 24 days); Jenness, 403 U.S. at

431 (5% of state's registered voters).8

Unlike the statutes under challenge in American Party

and other cases, however, the Maine statute requires Party candi-

dates to obtain the signatures of Party members, as opposed to

independent voters or voters enrolled in other political par-

ties.9 Accordingly, the Party insists, the onerousness of the

signature requirements must be defined, for constitutional pur-

poses, as a percentage of party membership (the "eligible pool of

8The Party does not complain about, and we do not consider,
the potential onerousness of the signature requirements for
district and county offices under the Maine statute as a percent-
age of the total population of registered voters in those politi-
cal subdivisions.

9The apparent purpose of Maine's party-member signature
requirement is to collapse into a single, administratively
simpler requirement two legitimate State interests: ensuring
sufficient party support among the electorate and sufficient
candidate support within the party. We are persuaded that these
State interests are constitutionally defensible individually and,
in combination, impose no impermissible burden on associational
rights in the present case.

19

possible signers"), rather than the entire electorate. See

Storer, 415 U.S. at 742-43. Any broader view, says the Party,

would treat all registered voters as potential Party enrollees,

"amount[ing] to forced political association" violative of First

Amendment rights. See Democratic Party v. Wisconsin, 450 U.S. at

122 ("the freedom to associate for the 'common advancement of

political beliefs' necessarily presupposes the freedom to identi-

fy the people who constitute the association, and to limit the

association to those people only") (quoting Kusper v. Pontikes,

414 U.S. 51, 56 (1973)); Consumer Party, 633 F.Supp. at 889-90

("a party may not be essentially required to broaden its message

or appeal in an effort to increase its membership; a group's

associative rights depend on having as members only those who

share a particular vision and collective purpose"); see also

Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984)

("freedom of association . . . plainly presupposes a freedom not

to associate").10

Viewed as the Party urges, the Maine scheme indeed

would appear onerous; the Party lacks sufficient membership

support in many districts and counties to meet the primary-ballot

10The Party presented no evidence that its low membership
levels are related to voluntary exercise of its associational
right to exclude would-be members. Nevertheless, challenges to
the overbreadth of a statutory scheme, as impeding appellants'
First Amendment associational rights, are widely recognized as
exceptions to the rule that "a person to whom a statute may
constitutionally be applied will not be heard to challenge that
statute on the grounds that it may conceivably be applied uncon-
stitutionally to others." See Broadrick v. Oklahoma, 413 U.S.

601, 610 (1973).

20

access requirements of 335. We see the issue somewhat differ-

ently, however. We need not decide whether there may be circum-

stances in which significant constitutional problems would result

from a regulatory scheme which precluded candidate access to a

party's ballot by different means than those under challenge in

this case. If such limits exist, it suffices to say that they

have not been reached under the Maine electoral scheme.

First, the burden about which the Party complains is

self-imposed, for the most part. Under Maine law, a party which

adopts restrictive membership policies is not required to assume

"qualified" status under 301 et seq., or to assume the burdens

of the primary nomination requirement imposed by 331. Indeed,

a party can choose to "disqualify" itself at any time up to April

15 of an election year, even after submitting the party designa-

tion and consent of its 'coattail' candidate under 302(1),

merely by eschewing the municipal caucuses required by 302-

(3).11 If a party voluntarily chooses or continues to

pursue the 302 procedure for electoral participation as a

"qualified" party, it must be understood to have assumed the

11The April 15 deadline occurs two weeks after the April 1
deadline for primary candidates to file nomination petitions
under 335(8). Thus, any new or small party, uncertain of its
membership support, may withhold the final certification neces-
sary for "party qualification" while it attempts to enroll the
members necessary to nominate its candidates to the primary
election ballot. If, by April 1, the required membership support
is lacking in one or more electoral districts, the party may
choose simply by withholding the certification of caucus
participation under 302(3) to nominate its candidates to the
general ballot by the "nomination petition" procedure prescribed
by 351 et seq.

21

burden of maintaining membership rolls sufficient to nominate

candidates through the primary election process.

Second, and equally important, a party which chooses

not to participate in primary elections as a "qualified" party

retains the option to qualify candidates for the statewide

election ballot through the 351 "nomination petition" proce-

dure. The Party has offered no evidence whatever to suggest that

this alternate route to the printed ballot is substantially more

burdensome for a small party than a primary-qualification proce-

dure.12 In fact, in the 1992 elections, at least three inde-

pendent candidates for President Lenora Fulani, H. Ross Perot,

and Howard Phillips mustered the requisite 4000 signatures and

qualified by petition to be listed, along with their chosen

"political designation," on Maine's general election ballot. As

the Supreme Court recognized in Jenness, 403 U.S. at 441-42, a

nomination petition procedure for ballot access by new or small

political parties is not inherently impermissible, merely because

it is different from the procedure permitted for larger parties,

provided the procedure imposes no undue burden. "There are

obvious differences in kind between the needs and potentials of a

12Although a "nomination petition" requires twice the number
of signatures a party candidate would be required to obtain on a
primary petition, see 21-A M.R.S.A. 354(5), these signatures

may be obtained from any registered voter, even voters enrolled

in other parties. Moreover, the number of required signatures is
still quite low, compared to the signature requirements upheld as
reasonable in other contexts by the Supreme Court. See supra pp.

18-19. And a party which mobilizes its efforts toward garnering
signatures on a nomination petition is spared "the Procrustean
requirement of establishing elaborate primary election machin-
ery." Jenness, 403 U.S. at 438.

22

political party with historically established broad support, on

the one hand, and a new or small political organization on the

other. [A State is not] guilty of invidious discrimination in

recognizing these differences and providing different routes to

the printed ballot." Id.; see also Munro, 479 U.S. at 193 ("[i]t

is now clear that States may condition access to the general

election ballot by a minor-party or independent candidate upon a

showing of a modicum of support [in a primary election] among the

potential voters for the office"); American Party, 415 U.S. at

782 ("so long as the larger parties must demonstrate major

support among the electorate at the last election, whereas the

smaller parties need not, the latter, without being invidiously

treated, may be required to establish their position in some

other manner").

Finally, even if a small party chooses to "qualify"

under 302, and to nominate its political candidates under the

primary election procedure, Maine law provides a means by which

party candidates may gain access to the general election ballot

by soliciting support from unenrolled registered voters through

write-in ballots cast in the primary election. The write-in

ballot option ensures that no qualified primary voter is denied

the opportunity freely to vote for the candidate of his or her

choice, and that a small party which is unable to meet the

minimal membership requirements for listing any candidates on its

primary ballot, despite "significant support" among the general

electorate in a particular district, may nonetheless nominate the

23

candidate who receives a plurality of primary voter support.

Unity Party v. Wallace, 707 F.2d 59, 62 (2d Cir. 1983) (write-in

candidacy is acceptable alternative to ballot listing where

ballot access requirement imposes de minimis encumbrance). The

one impediment is that the successful primary candidate's write-

in plurality must be sufficient to satisfy the numerical require-

ments of 723(1)(A) (which are, in any event, the same as the

"nomination petition" requirements of 351).13 See supra note

12.

IV

CONCLUSION

13The Supreme Court frequently has disapproved write-in
ballot alternatives to printed ballot access, where the write-in
alternatives would have disadvantaged small party candidates

opposing established party candidates whose names were printed on
the same ballot. See, e.g., Anderson, 460 U.S. at 799 n.26

(holding write-in procedure "not an adequate substitute for
having the candidate's name appear on the [general election]
ballot"); Lubin, 415 U.S. at 719 n.5 ("The realities of the

electoral process . . . strongly suggest that 'access' via write-
in votes falls far short of access in terms of having the name of
the candidate on the ballot . . . . [A candidate] relegated to
the write-in provision [is] forced to rest his chances solely
upon those voters who . . . remember his name and take the
affirmative step of writing it on the ballot"). However, in a
small party primary such as that involved here, where no names

are printed on the ballot, the Party's write-in candidates
competed only against other write-in candidates; they did not
compete "head to head" against established party candidates whose
printed names appeared on the ballot. In these circumstances,
the write-in procedure imposes little, if any, comparative
disadvantage to small party candidates who are able to muster the
requisite electoral support, and any awkwardness in the mechanics
of the write-in process is adequately counterbalanced, in our
view, by the State's legitimate interests in requiring that such
support be demonstrated.

24

Under Maine's election code, small political parties

may choose to "qualify" under the "sponsorship" procedure estab-

lished in 302(1), postponing any showing of "significant

community support" under 303, if the party, its sponsor, and

its candidates believe they can enroll enough members to meet the

requirements of primary ballot access under 335(5). If the

party is unable to meet these requirements for primary ballot

access, it may either (1) draw on independent voters in its

primary, mustering a qualifying number of write-in votes for its

party candidates, under 723(1)(A), or (2) disqualify itself

under 302(3), and proceed under the "nomination petition"

process of 351. The Libertarian Party attempted to enroll

members under 302(1), but failed. Rather than elect disquali-

fication, the Party then chose to muster independent voters to

its primary banner under the 338 write-in process. It again

failed to show "significant support." Under these circumstances,

we do not believe that appellants' constitutional rights, or the

rights of the Party's members or other prospective voters, were

impermissibly burdened by the Party's subsequent exclusion from

the general election ballot.

Affirmed.

25